W. J. WESTCOTT CO.
v.
YONK RUBIN & SON et al.
No. 12055.

United States District Court,
E. D. Pennsylvania.
July 28, 1954.

Sidney R. Zall, Philadelphia, Pa., for plaintiff.

Ned Stein, Philadelphia, Pa., for defendants.

CLARY, District Judge.

This is an appeal by Yonk Rubin & Son (hereinafter called "Rubin") from a reparation order by the Secretary of Agriculture made under the Perishable Agricultural Commodities Act, 7 U.S.C.A. § 499g(a), (hereinafter called "P.A.C.A."). The appeal is brought under Section 499 g(c) of the same Act from a finding in favor of complainant Sydney R. Shermann, trading as W. J. Westcott Company, (hereinafter called "Shermann"). Since this is a trial de novo, the Court now makes the following

## Findings of Fact.

1. Petitioner-respondent is an individual, Yonk Rubin, doing business as Yonk Rubin & Son, a licensed produce broker, with his principal place of business located in Philadelphia, Pennsylvania. At all times material hereto Rubin was licensed under P.A.C.A.

2. Plaintiff-appellee is an individual, Sydney R. Shermann, trading as W. J. Westcott Company, a dealer in produce, whose principal place of business is likewise located in Philadelphia, Pennsylvania.

3. L. A. Schiano, one of the above-named defendant-respondents, is an individual and a resident of Syracuse, New York. While named as a party to the action both before the Secretary of Agriculture and in this Court, he appeared in neither place and is merely a nominal party to the action.

4. At about 1 a. m. on the morning of June 6, 1949, plaintiff Shermann, a dealer in produce, was present at his place of business located at 100 Dock Street, in the City and County of Philadelphia. At that time the above-named Schiano appeared and asked for a quotation on a wholesale lot of potatoes which Shermann had for sale. The potatoes involved were "North Carolina" potatoes. Shermann offered to Schiano, subject to a satisfactory credit check, a truckload of said potatoes consisting of 325 one hundred pound bags at $3.35 per bag for a total amount of $1,088.75, F.O.B. Shermann's place of business. Schiano agreed at that time to buy said potatoes but Shermann did not agree to sell them to him.

5. Shermann, knowing nothing of Schiano's credit rating, before proceeding further, consulted a list of names of approved credit risks which had been compiled by a credit bureau of which Shermann was a member. Schiano's name was not found on said list and Shermann thereupon informed Schiano that he would not extend credit to him. Schiano then requested Shermann to telephone Rubin and inquire about his, Schiano's, credit reliability. Schiano previously had had commodity transactions with Rubin and in addition had done trucking work for Rubin. Shermann then at that early morning hour telephoned Rubin at the latter's home in suburban Philadelphia and related to him the status of the proposed transaction, whereupon Rubin instructed Shermann to do nothing until he, Rubin, personally appeared at Shermann's place of business.

6. The established trade custom, fully understood by both Shermann and Rubin, was that, through the credit bureau aforesaid, settlement for any cerdit transactions occurring on June 6, 1949 would be consummated on June 15, 1949.

7. One hour after the aforesaid telephone call by Shermann to Rubin, at about 2 a. m., Rubin and his son appeared at Shermann's place of business and a discussion ensued between Rubin, Shermann and Schiano. Rubin inquired of Schiano as to the character of the potatoes and Schiano informed Rubin that they were "Okay". Schiano had previously inspected samples of the potatoes on the floor of Shermann's store and Rubin also inspected the said samples of potatoes and then told Schiano to purchase them.

8. Shermann at that junction and in the presence of both Schiano and Rubin again refused to sell Schiano the potatoes on the customary credit terms.

9. Rubin thereupon instructed Shermann to charge the potatoes to him stating that he would be the "responsible party" and that he would pay the bill. He further directed Shermann on the basis of these statements to deliver the potatoes to Schiano. Shermann then wrote up the necessary slips to effect delivery of the potatoes and handed them to Rubin, who passed them to Schiano, and Schiano took delivery of the potatoes in the presence of Rubin and Shermann. He then took the potatoes to Syracuse, New York, where he disposed of them.

10. Later in the morning of June 6, 1949, Rubin asked Shermann to send a bill directly and individually to Schiano.

His expressly stated purpose in making the request being "to make Schiano feel responsible". Rubin further instructed that a bill be made out to both Schiano and to him to be sent to his office at Second and Dock Streets, Philadelphia, Pennsylvania, stating that he would pay the bill.

11. On the same date, June 6, 1949, bills for the potatoes were sent by Shermann to both Rubin and Schiano in the amount of $1,088.75.

12. Shermann did not and would not have sold the potatoes to Schiano in reliance on Schiano's credit.

13. Shermann did sell the potatoes to Rubin relying upon Rubin's credit and the delivery to Schiano was at the specific direction of Rubin.

14. Shermann telephoned Rubin on June 15, 1949, and informed him that payment had not been received. Rubin then stated that payment would be forthcoming.

15. Shermann again telephoned Rubin on June 17, 1949, and Rubin stated that he had not received a bill and requested that a duplicate be sent. Bills were sent Rubin marked "duplicate bill".

16. Shermann has never received payment of $1,088.75 or any part thereof for the potatoes sold to Rubin and delivered to Schiano.

### Discussion.

 Petitioner-respondent's most strenuously argued contention in this case stems from the treatment accorded the facts by the Examiner for the Secretary of Agriculture. He concluded the transaction to be a guarantee by Rubin of the purchase price of the potatoes sold and delivered to Schiano. I have found that there was an actual sale by Shermann to Rubin which eliminates the question of guarantee. While the value of the goods exceeds $500, the Pennsylvania Sales Act, 69 P.S. § 42, was fully complied with, since the buyer accepted, at the time the contract was entered into, all of the goods contracted to be sold.

The defendant's contentions in relief of his own liability are (1) that his only connection with the transaction was that he merely stated as a fact that Schiano's credit was good, (2) that even assuming he did undertake to pay for goods sold to Schiano, the guarantee was not in writing, hence, is unenforceable under the Pennsylvania Statute of Frauds, 33 P.S. § 2, (3) the potatoes were not in interstate commerce within contemplation of the Act. The strongly urged contention and the one initially adverted to is that the Secretary of Agriculture under Section 499b of the P.A.C.A., which defines unfair conduct, has no power to make a reparation order based on a finding of a guarantee since a guarantee is not there specifically mentioned, hence it does not come within the terms of the Act and cannot constitute an unfair practice.

 I would have no difficulty in holding that the Secretary of Agriculture did have authority to issue his reparation order under Section 499b(4) even if the transaction were to be treated as a guarantee of the account by Rubin, rather than a direct sale, which I have found it to be. Section 499b(4) provides that a reparation order may be made against any commission merchant, dealer, or broker, who makes any false or misleading statement in connection with any transaction under the Act *or who fails without reasonable cause to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction.* That section of the Act appears clearly broad enough to include a contract of guarantee even though it be parol in form. The Secretary of Agriculture has the power under Section 499o of the Act, if he did not here have it directly from the express language of the Act itself, to make such orders as may be necessary to carry out the provisions of the Act, L. Gillarde Co. v. Joseph Martinelli & Co., Inc., 1 Cir., 169 F.2d 60, 61. To hold that a breach of parol contract of guarantee falls within the purview of unfair con-

duct as is proscribed in Section 499b(4) is certainly not transgressing that authority.

The facts as here found constitute a complete contractual obligation between Shermann and Rubin in respect of the subject matter of the contract, viz. the potatoes. The testimony of Shermann is supported by the testimony of independent witnesses. The preponderance of the evidence weighs heavily in the complainant's favor. Under Section 499b (4) of the Act, the Secretary of Agriculture has express authority to make the order complained of for failure of Rubin to make payment promptly. Therefore, the order must be affirmed.

### Conclusions of Law.

1. The Court has jurisdiction of the parties and the subject matter of the transaction. The potatoes involved in the transaction were in interstate commerce within the purview of the P.A.C.A.

2. The Secretary of Agriculture acting under the provisions of P.A.C.A. had jurisdiction to hear Shermann's complaint and to enter an appropriate reparation order.

3. Shermann sold and Rubin purchased from Shermann on June 6, 1949, 325 one hundred pound bags of North Carolina potatoes at $3.35 per bag, or a total of $1,088.75.

4. Rubin thereupon became indebted to Shermann in the sum of $1,088.75 and under the credit terms of the transaction, payment was due on June 15, 1949. Said obligation has not been satisfied in whole or in part.

5. Rubin is indebted to Shermann in the sum of $1,088.75 with interest thereon at the rate of 5% from June 15, 1949 to date.

6. Shermann is entitled to judgment in the amount set forth in the preceding finding, along with the costs of this action and a reasonable attorney's fee under 7 U.S.C.A. § 499g(c).

7. Judgment will be entered in Shermann's favor with costs.